Argued and submitted June 14, 2006, reversed and remanded on appeal and on cross-appeal March 28, 2007

EMPLOYERS INSURANCE OF WAUSAU,
a mutual company,
a Wisconsin mutual company,
*Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

TEKTRONIX, INC.,
an Oregon corporation,
*Defendant-Respondent*
*Cross-Appellant,*

*and*

CONTINENTAL CASUALTY COMPANY,
an Illinois corporation;
Travelers Indemnity Company,
a Connecticut corporation;
Aetna Casualty and Surety Company,
a Connecticut corporation;
Granite State Insurance Company,
a New Hampshire corporation;
National Union Fire Insurance Company of Pittsburgh, PA,
a Pennsylvania corporation;
Certain Underwriters at Lloyd's London;
Certain Underwriting Syndicates at Lloyd's London;
and DOES 1-100, inclusive,
*Defendants.*

TEKTRONIX, INC.,
an Oregon corporation,
*Third-Party Plaintiff,*

*v.*

AETNA CASUALTY & SURETY COMPANY,
a Connecticut corporation;
AIU Insurance Company,
a New York corporation;
Century Indemnity Company,
a Pennsylvania corporation;
Central National Insurance Company of Omaha,
a Nebraska corporation;

Certain London Market Insurance Companies,
foreign corporations;
Equitas Reinsurance Limited,
a foreign corporation;
Equitas Limited,
a foreign corporation;
Equitas Holdings Limited,
a foreign corporation;
Equitas Management Services,
a foreign corporation;
Equitas Policyholders Trust Limited,
a foreign corporation;
Granite State Insurance Company,
a New Hampshire corporation;
Highlands Insurance Company,
a Texas corporation;
Insurance Company of the State of Pennsylvania,
a Pennsylvania corporation;
National Union Fire Insurance Company of Pittsburgh, PA.,
a Pennsylvania corporation;
Oregon Insurance Guaranty Association,
an Oregon association;
and Travelers Indemnity Company,
a Connecticut corporation,
*Third-Party Defendants.*

Clackamas County Circuit Court
CCV9908032; A123664
156 P3d 105

Bryan M. Barber argued the cause for appellant-cross-respondent. With him on the briefs were Barber Law Group, San Francisco, and William G. Earle and Davis Rothwell Mullin Earle & Xóchihua P.C.

Robert M. Horkovich argued the cause for respondent-cross-appellant. With him on the briefs were Anderson Kill & Olick, P.C., New York, and Charles F. Hinkle, Scott J. Kaplan, and Stoel Rives LLP.

Gregory L. Baird and Gordon & Polscer, LLC, and Laura A. Foggan, John C. Yang, Alicia C. Ritter, and Wiley Rein & Fielding LLP filed the brief *amicus curiae* for Complex Insurance Claims Litigation Association.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge,* and Schuman, Judge.**

EDMONDS, P. J.

___

* Brewer, C. J., *vice* Richardson, S. J.

** Schuman, J., *vice* Wollheim, J.

**EDMONDS, P. J.**

This case involves the respective rights and obligations of plaintiff Employers Insurance of Wausau (Wausau) and defendant Tektronix, Inc. (Tektronix) concerning insurance polices issued by Wausau to Tektronix between 1973 and 1985. After Tektronix requested that Wausau indemnify it under those policies for costs associated with environmental cleanup at Tektronix's manufacturing facility, Wausau sought a declaration that it was not obligated under the policies to defend or indemnify Tektronix for those costs. Tektronix counterclaimed for breach of contract. Following a jury trial, the court entered judgment in favor of Tektronix for $1,455,660, plus prejudgment interest in the amount of $525,507. The court then awarded attorney fees and costs to Tektronix in the amount of $3,301,415.

Wausau appeals, arguing, among other things, that (1) the trial court should have granted its motion for a directed verdict on the grounds that Wausau was prejudiced by Tektronix's delayed notice of claims under the policies; (2) the court erred in failing to permit Wausau to offer extrinsic evidence of the parties' intent under the policies; (3) the trial court improperly instructed the jury regarding the burden of proving the applicability of the "sudden and accidental" exception to the pollution exclusion in the policies; (4) the court misinterpreted the meaning of the "sudden and accidental" exception; (5) the court erred in allowing Tektronix to recover its own employees' wages and benefits as "damages" under the policies; and (6) the amount of attorney fees awarded to Tektronix was excessive. Tektronix cross-appeals, arguing that (1) the court erred in removing from the jury's consideration the application of the exception to the pollution exclusion in certain parts of the manufacturing facility and (2) the court erred in failing to award prejudgment interest on part of the judgment. We reverse and remand.

## I. BACKGROUND

Since approximately 1960, Tektronix has operated a manufacturing facility in Beaverton, Oregon (the Campus).[1]

---

[1] The following factual background is, unless otherwise noted, undisputed. To the extent that the parties disagree as to certain facts, we address those facts

Over the years, the Campus has generated a significant amount of industrial waste. Specifically, operations at the Campus generated waste waters containing a variety of heavy metals and acidic and caustic waste waters that required neutralization before they could be discharged. Tektronix also used a variety of solvents to clean electronic and metal parts.

Beginning in 1963, the industrial waste waters were discharged into a wastewater treatment facility known as Building 40. Building 40 consisted of a series of treatment tanks and three "surface impoundments," or "lagoons," which were large holes dug in the ground to collect the partially treated waste waters. Originally, three surface impoundments were constructed with compacted natural soils. A concrete liner was installed in one of the impoundments in 1968, but the other two impoundments remained unlined until 1977.

The surface impoundments accumulated sludge at the bottom, which was periodically removed and spread on the ground at various Campus locations, including an area known as the Boneyard (later renamed West Park), which was adjacent to Building 40. Volatile organic solvents, such as trichloroethylene (TCE), were not treated by Tektronix's wastewater treatment facility, and TCE present in the processed waste waters passed through the treatment tanks and sludge-drying areas and then gradually leached into the soil and groundwater.

Tektronix also disposed of spent solvents by storing them in containers, usually 55-gallon drums, while awaiting recycling, reclamation, or other disposal. Tektronix constructed Building 02 and Buildings 10/12 to house these drums. Tektronix employees also placed spent solvents on the ground to help kill weeds. Tektronix also believed that there may have been regular nonspecific spills of solvent during the policy periods.

Beginning in 1980, the federal Resource Conservation and Recovery Act (RCRA) required Tektronix to take

---

under the separate assignments of error consistently with our standard of review for the particular assignment.

steps to license its treatment plant as a "Hazardous Waste Treatment Facility" and to obtain a Part A RCRA Permit. In January 1985, the Environmental Protection Agency informed Tektronix that, if it wanted to continue operating its treatment facility, it would need to apply for a RCRA Part B Permit. As a condition for the permit, Tektronix was required to conduct an investigation of the handling of hazardous waste throughout the Campus.

As part of its investigation, Tektronix interviewed more than 100 employees about their knowledge of waste disposal at the Campus. The investigation also included drilling wells to test groundwater contamination. Tektronix discovered solvent contamination of the groundwater beneath Building 40, Building 16 (a building adjacent to building 40), the Boneyard/West Park, Beaverton Creek, and Building 02. Tektronix ultimately was required to locate and clean up all contamination on the Campus. To accomplish this goal, defendant hired environmental contractors and paid its own employees from 1990 to 2002 for work associated with site remediation.

Wausau issued 12 general liability insurance policies to defendant for consecutive annual periods from June 1, 1973 to June 1, 1985. Each of those policies contained the following notice requirements:

"D. Insured's Duties in the Event of Occurrence, Claim, or Suit.

"1. In the event of occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place, and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

"With respect to the named insured, notice shall be given as soon as practicable after such occurrence comes to the attention of the insurance manager at the Beaverton, Oregon, corporate offices of the named insured.

"* * * * *

"2. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representative."[2]

Tektronix did not provide notice to Wausau of a claim for environmental cleanup costs until December 1997, 12 years after Tektronix began incurring those costs, believing that any claim would be subject to an exclusion from coverage in the policies. The exclusions provided:

"This insurance does not apply: * * * to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkali, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*[.]"

(Emphasis added.)

Beginning in 1985, with *Transamerica Ins. Co. v. Sunnes*, 77 Or App 136, 711 P2d 212 (1985), *rev den*, 301 Or 76 (1986), and continuing into the mid-1990s, we repeatedly concluded that contamination resulting from the regular and intentional discharge of waste was not subject to the "sudden and accidental" exception to similar exclusions in insurance policies.[3] Thus, we held in those cases that the exclusion applied to prevent coverage in those circumstances. However, in September 1996, the Supreme Court issued its opinion in *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 216, 923 P2d 1200 (1996). In *St. Paul Fire*, the

---

[2] Some of the policies contain slight variations in punctuation or wording. Those variations are not material to our discussion.

[3] *See, e.g., Mays v. Transamerica Ins. Co.*, 103 Or App 578, 585, 799 P2d 653 (1990), *rev den*, 311 Or 150 (1991) ("The evidence is clear that [the insured's corporation] intended to release the pollutants into the waste pit as a regular part of its business operations. The pollution exclusion precludes coverage for [the insured's] costs incurred in cleaning up the contamination."); *see also Carl v. Oregon Automobile Ins. Co.*, 141 Or App 515, 918 P2d 861 (1996); *Northwest Pump v. American States Ins. Co.*, 141 Or App 210, 917 P2d 1025, *modified on recons*, 144 Or App 222, 925 P2d 1241 (1996).

Supreme Court held that the term "sudden" in the exception to the standard pollution exclusion was ambiguous: " 'sudden' *may* have, but *need not* always have, a temporal element." 324 Or at 213 (emphasis in original). The court resolved the ambiguity in favor of the insured and concluded that the pollution exclusions in that case did not apply to "discharges, dispersals, releases, or escapes that are 'unintended and unexpected.' " *Id.* at 216.[4]

In the wake of *St. Paul Fire*, Tektronix notified Wausau of its environmental cleanup activities and sought coverage under its policies with Wausau. Wausau initially reserved its right to deny coverage but agreed to provide a defense to Tektronix regarding third-party claims. Subsequently, Wausau initiated this action seeking a declaratory judgment that it had no obligation to defend or indemnify Tektronix with respect to claims based on contamination at the Campus. Tektronix counterclaimed, alleging that Wausau had breached its obligations under the policies to cover "unexpected and unintended releases of hazardous substances."

Ultimately, the case was tried. After a two-week trial, the jury returned a verdict determining that Wausau had not been prejudiced by the delayed notice and that Tektronix did not expect or intend the release of pollutants at any of the areas at issue.[5] The jury also found that Tektronix had incurred damages in the amount of $1,901,437. The trial court entered judgment on Tektronix's breach of contract claim in a reduced amount of $1,447,272, based on the fact that some of the contamination occurred before the policies were in effect.[6] Subsequently, the trial court awarded attorney fees to Tektronix. The current appeal and cross-appeal followed.

---

[4] *St. Paul Fire* is discussed in greater detail later in this opinion. 211 Or App at 505-08.

[5] Before trial, the court granted a motion *in limine* that removed from the jury's consideration the application of the pollution exclusion to the areas of Boneyard/West Park and Building 16. That ruling is the subject of Tektronix's cross-appeal.

[6] Neither Wausau nor Tektronix challenges on appeal the trial court's allocation in this regard.

## II. ANALYSIS

A. *Wausau's Appeal*

Wausau advances eight assignments of error. The first assignment seeks reversal of the judgment and entry of judgment in favor of Wausau. The remaining assignments of error seek a new trial or pertain to attorney fees. For the reasons discussed below, we conclude that the case must be remanded for a new trial because the trial court incorrectly instructed the jury regarding the "sudden and accidental" exception to the pollution exclusion. However, with the exception of the third assignment of error, each of the alternative arguments for a new trial presents an issue likely to arise on remand and, for that reason, we address those assignments of error as well.

### 1. *Delayed Notice*

■ In its first assignment of error, Wausau contends that the trial court erred in denying its motion for a directed verdict on the issue of delayed notice. We review the denial of a defendant's motion for a directed verdict for any evidence to support the jury's verdict, viewing the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party—here, Tektronix. *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 159, 61 P3d 918 (2003) ("Because the jury weighed the evidence, judged the credibility of the witnesses, and resolved all conflicts in the evidence, this court may rely on any fact that finds support in the record.").

■■ When an insured fails to give immediate notice to its insurer of a possible claim, the viability of the insurer's policy obligation turns on a two-part inquiry: (1) whether the insurer was prejudiced by the delayed notice; and (2) if the insurer was prejudiced, whether the insured acted reasonably in failing to give notice at an earlier time. *Carl v. Oregon Automobile Ins. Co.*, 141 Or App 515, 520-21, 918 P2d 861 (1996) (citing *Lusch v. Aetna Cas. & Surety Co.*, 272 Or 593, 597-600, 538 P2d 902 (1975), and *North Pacific Ins. Co. v. United Chrome Products*, 122 Or App 77, 81, 857 P2d 158, *modified on recons*, 123 Or App 536, 858 P2d 1361, *rev den*,

318 Or 171 (1993)). The insurer has the burden of demonstrating prejudice. *Halsey v. Fireman's Fund Ins. Co.*, 68 Or App 349, 354, 681 P2d 168, *rev den*, 297 Or 601 (1984).

■ Wausau argues that it established "as a matter of law" that it was prejudiced by Tektronix's failure to give immediate notice of its claim and that Tektronix's failure to do so was unreasonable. Specifically, Wausau argues that, as a result of the 12-year delay in providing notice, it lost various claim-handling opportunities, such as the opportunity to settle and the ability to approve or disapprove work done by Tektronix employees regarding the claim. It further argues that its investigation of Tektronix's claim was impaired by the delayed notice. Tektronix, in response, contends that none of the matters raised by Wausau constitutes prejudice "as a matter of law." According to Tektronix, whether Wausau was in fact prejudiced by the delayed notice is a matter that was within the province of the jury, and the jury's determination is supported by evidence in the record. For the reasons that follow, we conclude that Wausau was not entitled to a directed verdict on the issue of prejudice.

Wausau's arguments focus on the existence of various "lost opportunities" to make claim-handling decisions, including the opportunity to settle. Essentially, Wausau argues that these lost opportunities constitute prejudice as a matter of law, regardless of whether there is evidence tending to show that the insurer would have taken advantage of the opportunities. In support of that proposition, Wausau relies on *Bailey v. Universal Underwriters Ins.*, 258 Or 201, 474 P2d 746 (1970), *Lusch v. Aetna Cas. & Surety Co.*, 72 Or 593, 538 P2d 902 (1975), *Hartford Accident v. Premier Insurance*, 276 Or 847, 556 P2d 960 (1976), and *Carl.*

In *Bailey*, the court addressed the breach of a noncooperation agreement in an insurance policy. The court

> "expressly recognize[d] the rule that in order for non-cooperation to provide a defense, whether by a named insured or by a person who becomes an insured under the terms of the insurance policy, *the insurance company has the burden to plead and prove that it has suffered prejudice as a result.*"

258 Or at 219 (emphasis added). The insurer in *Bailey* argued that it had suffered prejudice because its insured had misrepresented facts relating to ownership of the car he was driving and had allowed a default judgment to be entered against him. The court explained:

> "Applying these rules [concerning prejudice] to this case, it would appear that if defendant is entitled to urge the defense of non-cooperation it would then follow from the fact that a default judgment was entered against [the driver] that defendant was prejudiced, as a matter of law, unless defendant could and should have made application to set aside that judgment upon learning the true facts."

*Id.* The court concluded that it was questionable whether the insurer even had standing to move to set aside the default judgment and, more importantly, that nothing would have *required* the court, in the exercise of its discretion, to set aside the default. Thus, the court concluded, "since the trial judge was not required to do so, we still must hold that defendant was prejudiced, as a matter of law, by the entry of that judgment, without considering in what other ways it may also have been prejudiced." *Id.* at 220-21.

In *Lusch*, the Supreme Court employed the prejudice rule articulated in *Bailey* in the context of a delayed notice. *Lusch* involved an insured who had been in an automobile accident in which multiple people were injured; he walked away from the scene of the accident without leaving any identifying information, believing that the authorities could not connect him with the accident. His insurer received notice of the accident from one of the injured parties' insurance companies almost a month after the accident. The insurer investigated and concluded that it was not obligated to defend the insured. The insured thereafter brought a declaratory judgment action seeking a declaration of coverage under his policy with the insurer. At trial, the insured requested a jury instruction that would have told the jury that "the purpose of the notice condition in the insurance policy is to acquaint the insurance company with the occurrence of an accident so that it may make a proper investigation in order that it can determine whether a claim is likely to be made against the insured." 272 Or at 596.

At the outset of its analysis, the court first stated its "conclusions on the proper means of interpreting the notice of accident provision and then relate[d] these conclusions to [its] previous decisions." *Id.* at 597. The court explained:

"If the insured does not give notice immediately after the accident or if notice is given by a third party, *the initial question should be whether the notice is given in time for the insurer to adequately investigate the potential claim and thus protect itself and the insured.* This is the purpose of giving notice. Restated, the question is whether the insurer is prejudiced by the failure of the insured to give notice as soon as practicable. * * * [I]f the insurer is not prejudiced by the insured's failure to give notice as soon as practicable, the insurer cannot escape its policy obligations."

*Id.* (emphasis added).

Ultimately, the court remanded the case for a new trial with jury instructions correctly stating the law. Thus, although the court in *Lusch* laid out the test for prejudice, it did not actually apply it to the facts in that case or explain when a party would be prejudiced "as a matter of law."

The cases following *Lusch* have fallen into one of two categories. In one category, courts have determined that insurers have suffered prejudice "as a matter of law" where no reasonable juror could reach a contrary conclusion based on the evidence in the record. For example, the year after *Lusch* was decided, the Supreme Court decided *Hartford*, another case involving a notice requirement in an automobile liability policy. This time, the dispute was between coinsurers of the insured; one of the coinsurers received notice and investigated the claim, but the other was not notified. The coinsurer that received notice argued that there was no prejudice. The court disagreed, relying on a statement in *Oregon Farm Bureau v. Safeco*, 249 Or 449, 452, 438 P2d 1018 (1968), regarding the purpose of the notice provision:

"The purpose of the notice required by the usual automobile liability insurance contract is to permit the insurer, as quickly as possible, to discover all relevant facts and to make such management decisions as it deems proper in light of those facts. While it is true that one insurance carrier received prompt notice of the accident and thus was

able to deploy its forces for an investigation satisfactory to that carrier, that investigation was not necessarily calculated to help another carrier make its decisions with reference to settlement efforts, strategy, reserves, or any of a variety of other matters that might be of interest to a claims department."

*Hartford*, 276 Or at 850-51. Based on that reasoning, the court concluded that one coinsurer "cannot be deprived of its right to investigate and adjust the claims under its policy merely because [another insurer] was investigating and adjusting the same claims under its policy." *Id.* at 851.

Subsequently, we decided *Carl*, a case that, like this one, involved delayed notice in the context of a claim for environmental cleanup costs. We concluded that, viewed in the light most favorable to the plaintiffs, "none of the information offered by [the] plaintiffs would allow [the insurers] to determine what caused the hole in the tank, or whether the hole was the sole source of the contamination. Neither does that information allow [the insurers] to investigate possible third party claims." 141 Or App at 522. We noted that the witnesses to the excavation of the contaminated soil had no interest in determining the source of contamination; the transcript and photographs were concerned only with the present condition of the site and not when the contamination began or how it progressed; the test results were not part of the summary judgment record; the photographs of the damaged tank showed only the size of the hole and contributed nothing to an examination; and the transcript of the removal process made no mention of how the contamination started or how far it had spread. *Id.* at 522. Thus, we concluded that the plaintiffs had not met their burden to create a material issue of fact with respect to the insurers' ability to investigate. *Id.*

In a second category of cases, we have found that late notice resulting in lost claim-handling opportunities was a matter for the jury because the evidence was susceptible to competing inferences. In *Halsey*, the insureds terminated the lease of their tenant because of an alleged breach of that lease. 68 Or App at 351. The tenant sued the insureds and obtained a judgment against them for $21,709. The insureds did not file a proof of loss with their insurer until after judgment had been entered. In a subsequent action concerning

coverage, the insurer moved for, and was granted, summary judgment because it had not had time to make a reasonable investigation. We reversed, holding that "[a]n insurer is not prejudiced as a matter of law just because it receives notice after a claim has been settled or tried." *Id.* at 353. We relied on the fact that the insurer had, in its letter of denial, indicated an alternative basis for denial—that the matter was not within the scope of coverage provided in the policy. We concluded from that letter that there was an issue of fact because the insurer "might have denied coverage on that basis *even if it had been notified of the claim before trial and had had an opportunity to investigate it at that time.*" *Id.* (emphasis added). We further noted that the tenant's judgment was for less than half of the damages he sought, and there was no indication that the insurer would have achieved a better result had it been notified before trial. *Id.*

Similarly, in *North Pacific Ins. Co. v. United Chrome Products*, 122 Or App 77, 81, 857 P2d 158 (1993), we concluded that summary judgment was inappropriate on the issue of prejudice. The insured operated a chrome plating facility from the late 1950s to November 1984. During the course of the plating, the insured deposited chrome in a dry well and plating tanks on the property, which later contaminated the ground water. The insurer argued that it was prejudiced by late notice of the claim in 1989 because it could not conduct an investigation; there were several different policies in effect in different years, and without an exact date of damage, the insurer claimed that it could not determine which policies to apply. The City of Corvallis, in response, argued that the dates of specific instances of "sudden and accidental" pollution could be narrowed down to certain years, and that the insurer would have enough information to identify the appropriate policies. We concluded that, "[o]n this record, there are material issues of fact whether prejudice exists." *Id.* at 82.

■ The foregoing cases establish that whether an insurer has been prejudiced "as a matter of law" depends on the permissible inferences that can be drawn from the evidence in the record. If a reasonable juror could find from the evidence that the insurer has not been prejudiced—either because the information available to the insurer would have

allowed it to conduct an adequate investigation or otherwise protect its and the insured's interest, *North Pacific Ins. Co.*, 122 Or App at 82, or because the insurer would not have taken advantage of any additional opportunities to investigate or otherwise protect its interest and that of the insured, *Halsey*, 68 Or App at 354—the insurer is not entitled to judgment as a matter of law.

Here, Tektronix presented evidence that Wausau, as part of its investigation, did not interview any current or former Tektronix employees about the contamination despite testimony from the Wausau claims investigator for the Tektronix investigation that he conducted personal witness interviews "all the time." Wausau also contended that it was never provided the names of witnesses and that certain witnesses were deceased. However, Tektronix presented contrary evidence that Wausau was provided documents or otherwise had access to information that would have allowed it to identify the relevant witnesses. At trial, Tektronix presented live testimony from some of the witnesses who Wausau claimed were dead. Wausau's claims investigator further testified that Tektronix denied him access to parts of the Campus; Tektronix also presented contrary testimony that it was willing to cooperate with the investigation and did not deny access to any of the Campus. In addition, Tektronix presented evidence that boxes of information regarding contamination at the Campus had been provided to Wausau, but that Wausau had elected not to review most of those boxes or follow up on what had been provided to it. Finally, Tektronix's expert witness, an experienced casualty underwriter, testified that Wausau was given an adequate opportunity to investigate the documents made available to it and to interview available witnesses.[7]

We view the above evidence in the light most favorable to Tektronix, and we give Tektronix the benefit of all

_____

[7] Wausau also relies heavily on the fact that notes, memoranda, and outlines of the more than 100 witness interviews that Tektronix conducted are no longer available. However, the significance of that loss must be evaluated in the context of all of the evidence that was available for Wausau to determine coverage issues. The jury could have concluded, based on all of the evidence in the record—and based on Wausau's investigation—that the 100 witness interviews would not have prejudiced the investigation or affected Wausau's claim handling decisions.

reasonable inferences that can be drawn from that evidence. *Woodbury*, 335 Or at 159. From the evidence that Wausau failed to conduct a diligent investigation, and the evidence that its witnesses were less than truthful regarding the nature of the investigation, the jury could have concluded that Wausau was not in fact prejudiced by the delayed notice. The jury could have further inferred from that evidence that, had notice been given in a timely manner, Wausau still would not have conducted an adequate investigation and would have denied Tektronix's claims for any one of the myriad reasons other than delayed notice that were listed in its complaint and answer to Tektronix's counterclaims. Thus, this case more closely resembles those cases in which we have concluded that the issue of prejudice is a matter for the jury. *See North Pacific Ins. Co.*, 122 Or App at 82; *Halsey*, 68 Or App at 354. It follows, based on the evidentiary record before us, that the trial court correctly denied Wausau's motion for a directed verdict.[8]

■ In its second assignment of error, Wausau makes the related argument that the trial court erred in excluding evidence regarding Wausau's ability to settle with Tektronix for a reduced sum. Wausau filed a motion *in limine* requesting that it be allowed to offer evidence that, "had Tektronix given notice to Wausau of its claims for coverage, Wausau almost certainly would have resolved Tektronix's claims for a small fraction of what Wausau is now being asked to pay." The trial court ruled that the lost opportunities to settle at a reduced rate with Tektronix—based on the parties' understanding of pre-*St. Paul Fire* case law—is not the kind of prejudice that excuses performance of policy obligations under *Lusch* and its progeny. According to the trial court, *St. Paul Fire* "simply set forth what the parameters of this insurance contract were and always had been * * *. [T]he prejudice has to be some loss of some right or result to which [Wausau] would otherwise have been legally entitled." Because, in the court's view, the lost opportunity to settle with Tektronix was not legally cognizable as prejudice, it followed that the evidence proffered

---

[8] Wausau asks us to adopt a "*per se* rule" that notice after six years is simply too long, and that prejudice should be "conclusively presumed." We reject that invitation without discussion.

by Wausau regarding such a settlement was not relevant and therefore inadmissible. We agree with the trial court's ruling.

Essentially, Wausau sought to offer evidence that, had it been notified when the contamination occurred, it would have attempted to settle with Tektronix based on the parties' understanding that coverage for the contamination was excluded under the pollution exclusions in the policies. Because the existing case law supported its interpretation, it is, in Wausau's view, a jury question as to whether Tektronix would have settled its claims at that time. It was only after *St. Paul Fire* was decided that Wausau acquired significant exposure to liability, and therein, according to Wausau, lies the reason why it has been prejudiced by Tektronix's delayed reporting. Tektronix responds that, as a matter of law, the above facts do not fall within the universe of legally cognizable "prejudice" because, when the policy coverage provisions are correctly interpreted, they provide coverage based on the exception in the exclusion provision; in other words, an insurer is not prejudiced when it is held to the terms of the coverage of its policy. No Oregon appellate case of which we are aware has decided this issue.

Ultimately, the issue turns on whether Wausau's proffered evidence was relevant. If, as the trial court ruled, the evidence was not relevant, then Wausau's assignment of error must be rejected. On the other hand, if the evidence was relevant to Wausau's claim that it had been prejudiced by Tektronix's delayed reporting, then the jury should have been permitted to consider the evidence. OEC 401 provides that " '[r]elevant [e]vidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 402 provides that all relevant evidence is admissible, except as provided by the Oregon Evidence Code and other sources of constitutional, statutory, and decisional law.

The relevance of Wausau's proffered evidence depends on whether it would have a tendency to make the existence of any legally cognizable prejudice to Wausau based on the delayed notice more or less probable. Insurance polices are contractual in nature and are interpreted, for the

most part,[9] like any other business contract. Their interpretation is a question of law, and in interpreting a term in an insurance policy, our goal is to ascertain the intent of the parties. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469-71, 836 P2d 703 (1992); *U.S. West Properties, Inc. v. AOI Compwise*, 156 Or App 411, 417, 965 P2d 467 (1998), *rev den*, 328 Or 365 (1999). Issues of contractual intent are determined by the objective manifestations of the parties based on the terms that they use and not on what they subjectively believe that the terms mean. *Kabil Developments Corp. v. Mignot*, 279 Or 151, 156, 566 P2d 505 (1977). Also, under Oregon law, an insurer is held to the obligations manifested by its objective intent, even in the event of delayed notice—regardless of any prejudice that has been suffered—provided that the insured acted reasonably in making the claim when it did. *Lusch*, 272 Or at 599-600.

Thus, the meaning of the coverage and exclusion provisions in Wausau's policies is determined by what those provisions objectively manifest. The terms are what they are; no change in their interpretation by a court changes what the parties to the policy intended. Therefore, although the case law pre-existing *St. Paul Fire* was a potential aid to the interpretation of Wausau's policies, those interpretations did not supplant the objective manifestations of the words (*i.e.*, the intent of the parties) in the policies. Hence, *St. Paul Fire* simply recognized the correct meaning of those terms as they originally existed in the policies and as the parties intended them to be interpreted.

In that light, it is evident that Wausau has not been "prejudiced" within the meaning of *Lusch* and its progeny as a result of its lost opportunity to settle at a reduced rate. The requirement to demonstrate prejudice in *Lusch* is designed to enforce the obligations of the parties under the contract. Wausau can point to no prejudice that results when it is held to the objective meaning of the terms to which it agreed in its

---

[9] When an insurance contract contains statutorily mandated terms, we must necessarily determine the meaning intended by the legislature. *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or 235, 244-45, 855 P2d 626 (1993). As discussed with respect to Wausau's fourth assignment of error, our method of interpreting an insurance policy deviates somewhat from the interpretation of other contracts in the case of an ambiguity. *See* 211 Or App at 504-05.

policies. It follows that the trial court did not err in excluding Wausau's proffered evidence because the evidence did not make it any more or less probable that Wausau had been prejudiced by the delayed reporting.

Wausau's third assignment of error is that "[t]he court erred in requiring [Wausau] to prove that it suffered prejudice as a result of [Tektronix's] late notice at each of five separate areas on [Tektronix's] campus." Wausau argues that the case involved a single "claim" within the meaning of the policies and that the verdict forms erroneously required the jury to assess prejudice to Wausau's opportunity to investigate the claims at each separate area of the Campus rather than prejudice relating to the claim as a whole. In response, Tektronix acknowledges that all of its evidence was directed at "Tektronix's right to coverage *as a whole*." (Emphasis in original.) Tektronix, however, contends that, "[a]s a matter of simple mathematics, if Wausau did not establish prejudice for any particular component of Tektronix's claim, it could not have done so for the entire claim." As will be discussed below, the case must be remanded to the trial court because the jury was improperly instructed regarding the "sudden and accidental" exception to the pollution exclusion. Given the focus of Tektronix's response to the third assignment of error, which we understand to be primarily a harmless error analysis, it is not clear that this issue will arise again on remand. For that reason, we decline to discuss it further.

2. *The "sudden and accidental" exception to the pollution exclusion*

a. Exclusion of extrinsic evidence

In its fourth assignment of error, Wausau contends that the trial court erred in excluding extrinsic evidence of the parties' intent regarding the meaning of the term "sudden" in the pollution exclusion. According to Wausau, "it is well established that interpretation of an insurance policy is governed by the law of contracts," including the rule that, if an ambiguity is found in the contract, the next step is to examine extrinsic evidence of the parties' intent. Because the Oregon Supreme Court held that the term "sudden" is ambiguous, *see St. Paul Fire*, 324 Or at 215-16, Wausau argues that

it should have been permitted to offer extrinsic evidence of the parties' understanding of the term.

■ This court has recently held that, despite ordinary rules of contract interpretation, extrinsic evidence of the parties' intent is not part of the interpretation of an insurance policy under Oregon law. *Andres v. American Standard Ins. Co.*, 205 Or App 419, 424, 134 P3d 1061 (2006) (stating that, since *Hoffman Construction Co.*, 313 Or at 469-71, the Supreme Court has been clear that "the interpretation of insurance policies is a question of law, not one that is resolved by reference to evidence extrinsic to the policy itself"). Accordingly, the trial court did not err in excluding Wausau's extrinsic evidence of the parties' understanding of the term "sudden" in the pollution exclusion.

b. Interpretation of the exception to the pollution exclusion

In its fifth assignment of error, Wausau argues that the trial court erred in ruling that the "sudden and accidental" exception to the pollution exclusion covers discharges of pollutants into unlined pits in the ground at Building 40. According to Wausau, *St. Paul Fire* distinguishes between "unintended and unexpected" releases from leaks, ruptures, and spills, on the one hand, and leaching from surface impoundments, on the other. The assignment frames an issue of law about how the exclusion provision and its exception should be interpreted.

We turn to the Supreme Court's decision in *St. Paul Fire*. In that case, the insured (M&B) owned and operated wood treatment plants in Portland, Oregon, and Stockton, California, during the period from 1949 to 1985. The treatment process included the use of pentachlorophenol (PCP), creosote, and heavy metal salts such as arsenic, chromium, and copper. "As a result of M&B's operations at both facilities, chemicals leached into the soil and contaminated the soil and groundwater. At the Portland plant, surface water also was contaminated." 324 Or at 189. The contamination at both plants was "attributable, in part, to leaching from 'surface impoundments.'" *Id.* The surface impoundments were "uncovered pits that M&B used to store the waste water produced during the wood treatment processes." *Id.* at 189-90.

Uncovered pits were standard in the wood treatment industry and were used at the Portland facility from 1967 to 1971 and in Stockton from 1942 to 1978. M&B believed that the pits would hold the waste and permit liquids to evaporate over time.

In the late 1970s, M&B learned that contaminants placed in the surface impoundments leached through layers of soil into the subsurface soil and groundwater. But the leaching was not the only source of contamination. "Additional damage was caused by overflow from storage tanks, by equipment failures, and by storm-water runoff from treated products and equipment, which were coated with preservatives." *Id.* at 190. "M&B also presented evidence that, during a labor dispute at the Portland plant in 1949 or 1950, someone opened a flange bolt on a storage tank, causing nearly 50,000 gallons of creosote to spill onto the soil." *Id.*

In the 1970s and 1980s, M&B entered into consent decrees with the California Regional Water Quality Control Board and the Oregon Department of Environmental Quality to clean up the Stockton and Portland facilities. In 1987, M&B demanded that its insurers defend and indemnify it with respect to the investigation and cleanup costs for both facilities. St. Paul Fire & Marine Insurance Company, Inc., and St. Paul Mercury Insurance Company, Inc., M&B's insurers, sought a declaration that they were not obligated to defend or indemnify M&B and also named other insurance companies as defendants. M&B cross-claimed against all of the other insurer defendants. On motions for summary judgment, the trial court ruled that M&B did not have coverage under any of the policies issued between 1949 and 1985. With respect to several other insurers, the trial court ruled that coverage was excluded under a pollution exclusion in the policies. That exclusion provided:

> "It is agreed that this insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge,*

*dispersal, release or escape is sudden and accidental.* (Emphasis added.)"

324 Or at 198. On appeal, this court affirmed the trial court's ruling.

The Supreme Court reversed. It began by emphasizing that the pollution exclusion "refers only to 'discharge[s], dispersal[s], release[s] or escape[s]' that are 'sudden and accidental.' No 'sudden and accidental' limitation is placed on the property damage 'arising out of' such events." *Id.* at 212. The court next summarized the insurers' arguments:

"The insurers argue that the phrase 'sudden and accidental' is unambiguous. Under their reading of the policies, 'sudden' has 'a temporal meaning, connoting an abruptness and short duration that precludes coverage for the ongoing, repeated, long term activities that caused innumerable discharges.' Moreover, an 'accidental' event must be an *event* that is unintended; an accidental event cannot be something that is 'allowed to occur as part of [M&B]'s regular business practices for more than four decades.'"

*Id.* at 212-13 (emphasis in original). In turn, M&B argued that the phrase "sudden and accidental" event means an "unintended and unexpected" event that causes property damage. *Id.* at 213.

The court next examined the dictionary definitions of the terms "sudden" and "accidental" as well as previous interpretations of those terms in the business insurance context. The court ultimately found the phrase to be susceptible to more than one interpretation:

"Under the methodology described above, 324 Or at 192-93, we conclude that the pollution exclusion is ambiguous. Accordingly, we construe the policy against the drafter. We hold that the pollution exclusions contained in the [insurers'] policies do not apply to discharges, dispersals, releases, or escapes that are 'unintended and unexpected.'

"M&B presented evidence that contaminants from the surface impoundments leached into the groundwater and subsurface soil during the effective periods of the pertinent policies. M&B presented additional evidence that leaks, ruptures, and spills at the plant occurred during that time and that those events also affected the groundwater and

subsurface soils. M&B presented evidence that the contamination that resulted from those events—the discharge, dispersal, release or escape of the contaminants—was unexpected and unintended.

"The trial court erred when it granted summary judgment in favor of [the insurers] on the 'pollution-exclusion' issue. The Court of Appeals erred when it affirmed that ruling."

*Id.* at 216.

■ In Wausau's view, the *St. Paul Fire* court distinguished between property damage caused by leaching from surface impoundments and damage caused by leaks, ruptures, and spills. Specifically, Wausau argues that "those events" in the third sentence of the next to last paragraph quoted above "refers only to the types of discharges listed in the immediately preceding sentence in the opinion—leaks, ruptures and spills." Thus, under Wausau's interpretation of the exception to the exclusion in *St. Paul Fire*, coverage exists only for property damage caused by unintended and unexpected leaks, ruptures, and spills from impounded contaminants. In its view, property damage caused by leaching from unlined pits therefore would not constitute a covered event.

■ We disagree with Wausau's narrow reading of the previously quoted paragraphs in *St. Paul Fire*. At no point in its opinion does the court suggest that it is treating the subject of leaching from impoundments any differently from causes of other types of contamination. Indeed, the first sentence of the second paragraph quoted above expressly refers to contaminants from the surface impoundments that "leached into the groundwater and subsurface soil during the effective periods of the pertinent policies." Moreover, the interpretation of the policy that contamination caused by unintended and unexpected leaching is a covered event is consistent with the *St. Paul Fire* court's holding that the exclusion provision and its exception are ambiguous and should be construed against the drafter. As the court pointed out, the words "sudden and accidental" do not necessarily contain a temporal element. Rather, those words may refer to an unexpected or an unintended event. The jury was entitled to find, based on the evidence before it, that the leaching from

the pits in this case was such an event. Accordingly, we reject Wausau's fifth assignment of error.

### c. The jury instructions regarding the "sudden and accidental" exception

In its sixth assignment of error, Wausau contends that the trial court erred in assigning to it the burden of proving the application of the "sudden and accidental" exception to the pollution exclusion. For purposes of clarity, we quote again the exclusion provision and its exception:

> "This insurance does not apply: * * * to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkali, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*"

(Emphasis added.)

Wausau requested a jury instruction that would have allocated to Tektronix the burden of proving that each "discharge, dispersal, release or escape" was sudden and accidental. The trial court rejected that instruction. For the reasons stated below, we conclude that the trial court erred in that regard.

Under Oregon law, the initial burden of proving coverage is on the insured. *Lewis v. Aetna Insurance Co.*, 264 Or 314, 316, 505 P2d 914 (1973). Conversely, the insurer has the burden of proving that the policy excludes coverage. *Stanford v. American Guaranty Life Ins. Co.*, 280 Or 525, 527, 571 P2d 909 (1977). What is not clear, however, from Oregon law, is which party bears the burden of proving an *exception* to an exclusion like the one at issue here.[10] Again, we are presented

---

[10] Wausau and Tektronix refer throughout their briefs to the "burden of proof." As the Supreme Court pointed out in *State v. James*, 339 Or 476, 486, 123 P3d 251 (2005), that term is "inexact" and

> "has led, at times, to the use by practitioners of the same phrase to refer to different concepts, as in the case at bar. To avoid confusion in the future, this court will use the phrases 'burden of persuasion' and 'burden of production,' as we define them below, rather than the inexact phrase 'burden of proof.' "

We understand Wausau's arguments to encompass both the burden of persuading the jury and the burden of producing evidence, and Tektronix makes no argument

with an issue of first impression, insofar as Oregon law is concerned.

The trial court reasoned that the exception is most aptly considered part of the exclusion, and the insurer bears the burden of proving the application of an exclusion. Specifically, the trial court reasoned that

"the structure is just simply a drafting process, but that, really, the underlying contractual relationship with the parties is that they, the insurance company, is going to provide coverage for a whole range, particularly in the comprehensive general liability context, a whole range of risks and will provide coverage of—including pollution in certain instances. And it's up to the insurance company to prove that this falls outside of that general grant of insurance."

On appeal, Wausau argues that the majority of jurisdictions have held that the burden is on the insured "to show that the discharge or release of pollutants was 'sudden and accidental' within the meaning of the exception to the exclusion." *See, e.g., Aeroquip Corp. v. Aetna Cas. and Sur. Co., Inc.*, 26 F3d 893, 894-95 (9th Cir 1994) (citing cases supporting "majority" view that burden of proving application of "sudden and accidental" exception is on insureds); *Dutton-Lainson Co. v. Continental Ins. Co.*, 271 Neb 810, 820, 716 NW2d 87, 96 (2006) ("Courts that have considered the qualified pollution exclusion here presented have generally held that while the burden rests with the insurer to establish the initial applicability of the pollution exclusion by showing the discharge or release of a pollutant into the environment, the burden then shifts to the insured to show that the 'sudden and accidental' exception to that exclusion is applicable."); *see also* Lee R. Russ and Thomas F. Segalla, 17A *Couch on Insurance* 3d § 254.13 (2006) (citing cases for the proposition that

that those two concepts should be treated separately in this case. We see no reason to separate the burden of production and the burden of persuasion on this issue and therefore do not distinguish between them further. *See* OEC 305 (stating that a party "has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting"); OEC 307 (allocating the burden of production and stating that the "burden of producing evidence as to a particular issue is initially on the party with the burden of persuasion as to that issue"). Because the parties and the courts that have addressed the exclusion at issue have frequently referred to the "burden of proof," we use that term in the text of this opinion for convenience.

"the majority of courts now appear to place the burden on the insured as to the 'sudden and accidental' exception from the pollution exclusion").[11]

Courts that have placed the burden on the insured with respect to the "sudden and accidental" exception have generally followed the theory that the exception, in effect, creates coverage where it otherwise would not exist. *See, e.g., Aeroquip Corp.*, 26 F3d at 895 ("The 'sudden and accidental' exception creates coverage where it would otherwise not exist and thus the insured's burden of proving coverage extends to proof of this exception.").[12] That reasoning is persuasive. Provisions of insurance policies generally can be divided into two categories: provisions that grant coverage and provisions that limit or exclude coverage. The exception at issue, which provides coverage that otherwise would not exist for property damage arising from pollution, logically falls in the

---

[11] It is difficult to find a case in which the court has *not* placed the burden on the insured. In *New Castle County v. Hartford Acc. and Indem. Co.*, 933 F2d 1162, 1182 (3d Cir 1991), the court predicted that the Delaware Supreme Court would adhere to "the traditional distinction between coverage clauses and exclusionary clauses" and therefore placed the burden on the insurer. In *E.I. Du Pont De Nemours v. Admiral Ins.*, 711 A2d 45, 53 (Del Super Ct 1995), the Delaware Superior court subsequently took a different approach to Delaware law. Similarly, in *Colonial Tanning Corp. v. Home Indem. Co.*, 780 F Supp 906, 919 (ND NY 1991), the court, relying on *New Castle County*, predicted that the New York Court of Appeals would consider the exception to be part of an "overall exclusionary clause" on which the insurer had the burden. In *Northville Industries v. Nat. Union Ins.*, 89 NY2d 621, 634, 679 NE2d 1044, 1048-49 (1997), the New York Court of Appeals reached a contrary conclusion about the exception. In *U.S. Fidelity & Guar. v. Morrison Grain Co.*, 734 F Supp 437, 443 (D Kan 1990), *aff'd*, 999 F2d 489 (10th Cir 1993), the court placed the burden on the insurer, reasoning that "the Kansas case law would require the insurer to prove both damage from pollution and facts which disqualify the exception."

[12] *See also Aydin Corp. v. First State Ins. Co.*, 18 Cal 4th 1183, 1192, 959 P2d 1213, 1217-18 (Cal 1998) ("Read in the context of this broad exclusionary language, the 'sudden and accidental' exception serves to 'reinstate coverage' where it would otherwise not exist."); *Northville Industries*, 89 NY2d at 634, 679 NE2d at 1049 (shifting the burden to the insured "conforms with an insured's general duty to establish coverage where it would otherwise not exist"); *E.I. Du Pont De Nemours*, 711 A2d at 53 ("The traditional rationale for placing the burden on the insureds is the exception to the exclusion creates coverage where it would not otherwise exist."); Russ and Segalla, 17A *Couch on Insurance* 3d § 254.13 ("In many instances, a policy coverage exclusion is itself subject to exceptions or limitations. The exceptions to the exclusion have the effect of restoring coverage that would otherwise have been lost via the exclusion, in much the same way that a double negative is a positive.").

"coverage" category—a category in which, under the common law, an insured has the burden of proof.

Courts also have offered a number of practical and policy justifications for placing the burden on the insured. First, they note that, when the burden is on the insured, the insured has "an incentive to strive for early detection that it is releasing pollutants into the environment * * *." *Buell Industries v. Greater N.Y. Mut. Ins.*, 259 Conn 527, 551, 791 A2d 489, 504 (2002) (quoting *Northville Industries*, 89 NY2d at 634, 679 NE2d at 1044). Second, they reason that, as a practical matter, the insured is the party in a better position to "prove a negative," *i.e.*, that the discharge, dispersal, release, or escape was *not* sudden and accidental. Oregon courts have similarly relied on "considerations of fairness, convenience and policy" when allocating the burden of proof. *Brewer v. Allstate Insurance Co.*, 248 Or 558, 562, 436 P2d 547 (1968); *see also Nelson v. Hughes*, 290 Or 653, 658, 625 P2d 643 (1981). We are persuaded that such considerations weigh in favor of placing the burden on the insured in this case. The facts regarding an unintended and unexpected discharge are within the peculiar knowledge of Tektronix, and policy considerations support additional incentives for detecting and preventing "sudden and accidental" discharges, dispersals, releases, and escapes. As the court in *Aeroquip Corp.* reasoned, "the policyholder should be better able to prove the suddenness than the insurer would be able to prove its absence." 26 F3d at 895.[13]

Nonetheless, Tektronix disputes the characterization of the exception in the pollution exclusion as a "grant" of coverage. According to Tektronix, "the exception (for expected and intended pollution) from the exclusion (for pollution) is not a *grant* of coverage, which the policyholder would have the burden to establish; rather, it is one of the

---

[13] Although the incentive to detect the pollution and access to relevant information are the two most routinely cited policy concerns, some courts have identified others. For example, in *Fireman's Fund Ins. Companies v. Ex-Cell-O Corp.*, 702 F Supp 1317, 1328 (ED Mich 1988), the court concluded that an estimate of the probabilities weighed in favor of allocating the burden to the insured: "To claim that they come within the 'sudden and accidental' exception to the pollution exclusion, [p]olicyholders must contend that the more unusual event occurred—that the discharge or release of pollutants was sudden and accidental."

conditions of the *exclusion* from coverage, which the insurance company has the burden to establish." Moreover, Tektronix posits that the insurer has the "burden to draft exclusions and limitations that are clear," *North Pacific Ins. Co. v. Hamilton*, 332 Or 20, 29, 22 P3d 739 (2001), and that the policy easily could have eliminated any uncertainty by deleting the double negatives. That is, in Tektronix's view, the policy could have unambiguously stated the exclusion in the following terms: "This policy does not cover pollution that is expected and intended by the policyholder."[14]

Tektronix's argument effectively rewrites the policy language and is inconsistent with its own pleading. The policies contain a broad exclusion that precludes coverage for all "property damage arising out of the discharge, dispersal, release or escape of * * * *contaminants or pollutants into or upon land*[.]" The exception that follows that broad exclusion then has the effect of providing coverage where it otherwise would not exist under the exclusion in the policies. Although the exclusion could have been drafted in terms of non-"sudden and accidental" occurrences, that is not the language of the policies. As it is drafted, the "sudden and accidental" clause in the policies describes occurrences that are *covered*, not occurrences that are *excluded* from coverage. Thus, the "sudden and accidental" exception is more aptly termed a "coverage" provision than part of the exclusion. *See Aydin Corp. v. First State Ins. Co.*, 18 Cal 4th 1183, 1192, 959 P2d 1213, 1218 (Cal 1998) (the fact that a differently drafted pollution exclusion might result in a different allocation of the burden of proof is not persuasive; the court's obligation is "to give effect to the language the parties chose, not the language they might have chosen"). Indeed, with respect to its entitlement to coverage for purposes of its counterclaims, Tektronix alleged that the property damage was caused by the "unexpected and unintended releases of hazardous substances" and that Wausau and other insurance companies "breached their obligations * * * by refusing or otherwise failing to pay Tektronix for all sums that Tektronix has paid, or has or may become legally obligated to pay, because of the unexpected or

---

[14] For additional discussion of similar arguments, see the dissenting opinions of Justices Mosk and Kennard in *Aydin Corp.*, 18 Cal 4th at 1195-1208, 959 P2d at 1219-28.

unintended property damage occurring during the policy periods of the Insurance Policies." Because the exception—as drafted—describes an entitlement to coverage, we are persuaded that the insured should bear the burden of proving that the relevant "discharge, dispersal, release, or escape" was "sudden and accidental," or, as that phrase was interpreted in *St. Paul Fire* and as alleged by Tektronix, "unexpected and unintended." *See Lewis*, 264 Or at 316 (burden is on the insured to prove a covered loss).

Moreover, we are convinced that such an allocation is consistent with the principles that Oregon courts generally have used in allocating the burdens of production and persuasion in contract cases. *See Weatherspoon v. Allstate Ins. Co.*, 193 Or App 330, 334, 89 P3d 1277, *rev den*, 337 Or 327 (2004) ("Insurance policies are contracts."). Typically, in the context of contractual disputes, Oregon courts have required the party seeking the benefit of a particular provision to bear the burden of proving its application. *See Howland v. Iron Fireman Mfg. Co.*, 188 Or 230, 304, 213 P2d 177 (1949) (plaintiff had the burden of proving that the terms of the contract entitled him to more burners than were supplied); *Buckman v. Hill Military Academy*, 182 Or 621, 635, 189 P2d 575 (1948) (defendant, who sought to take advantage of a condition subsequent defeating a cause of action based on the contract, bore the burden of proof on that matter); *Briscoe v. Jones*, 10 Or 63, 64 (1881) (burden of proving performance rests with the party seeking to enforce the agreement); *Amfac Foods, Inc. v. Int'l Systems*, 52 Or App 907, 918, 630 P2d 868 (1981), *rev'd on other grounds*, 294 Or 94, 654 P2d 1092 (1982) (party defending against liability on the ground that vendor did not comply with contractual requirement of prior written authorization for repairs bore the burden of producing evidence on that issue). In this case, Tektronix seeks the benefit of the exception to the pollution exclusion. For that reason, it is appropriate that Tektronix bear the burden of proving that the exception is applicable.

For all of the above reasons, we conclude that the trial court improperly instructed the jury as to which party bore the burden of demonstrating the applicability of the "sudden and accidental" exception. The prejudice to Wausau is clear; the evidence is in conflict as to whether Tektronix's

property damage was caused by an unexpected or unintended event, and a proper jury instruction regarding the burden of proving the applicability of the exception could have changed the outcome of the trial. Accordingly, the judgment in favor of Tektronix must be reversed and the case remanded for a new trial so that such a jury instruction can be given.

### 3. *Payment of employee wages and benefits*

In its seventh assignment of error, Wausau argues that the trial court should have excluded evidence of Tektronix's payment of salaries and benefits to its own employees because Tektronix's internal labor costs are not recoverable as "damages" within the meaning of the policies. As explained above, because the issue is likely to arise on remand, we address it at this time.

Tektronix offered evidence that it incurred expenses in the form of wages paid to its own employees to remedy groundwater contamination at the site. Under the policies at issue, Wausau agreed to "pay on behalf of the INSURED all sums which the INSURED shall become legally obligated to pay as DAMAGES" because of covered property damage. (Uppercase in original.) Whether the term "damages" includes payments made by an insured to its own employees to remedy contamination depends on the meaning of the word "damages" as used in the preceding quotations from the policies.

Once again, our objective in construing an insurance policy is to determine the intent of the parties. *Hoffman Construction Co.*, 313 Or at 469. The intent of the parties is determined by a three-step process. First, we examine the text of the policy to determine whether it is ambiguous, that is, whether it is susceptible to more than one plausible interpretation. If it is not, the policy is interpreted in accordance with that unambiguous meaning. *Id.* at 469-70. If the text of the policy includes any definitions of disputed terms included in the policy, we must construe the policy in accordance with those definitions. *See Andres*, 205 Or App at 423. If the policy does not define the terms in dispute, we invoke assumptions about "ordinary meaning" and other aids to construction. *Hoffman Construction Co.*, 313 Or at 470. If the text of the

policy is ambiguous, we proceed to the second step, that is, we examine the disputed terms in the broader context of the policy as a whole. *Id.* Finally, if, after construing the terms in the broader context of the policy as whole, ambiguity remains, we construe the policy against the drafter, in this case, Wausau. *Id.* at 470-71.

Whether the term "damages" as used in the policies encompasses payments made by an insured to its own employees to remedy contamination is not discernible by reference to an express definition in the policies.[15] Relying on the dictionary definition of that term, we have held that " '[d]amages' has a well-understood common meaning: 'the estimated reparation in money for detriment or injury sustained : compensation or satisfaction imposed by law for a wrong or injury caused by a violation of a legal right[.]' *Webster's [Third New Int'l Dictionary]* 571 [unabridged ed 2002]. Damages, therefore, concern reparation or restitution." *Barrett v. Dept. of Corrections*, 203 Or App 196, 200, 125 P3d 98 (2005), *rev den*, 341 Or 197 (2006). Thus, the plain meaning of the term "damages," in isolation, simply *requires* that the reparation be for detriment or injury sustained, and

---

[15] We note that, under a section of the policies titled "Definitions," the policies state that

" '[d]amages' 'includes (a) with respect to bodily injury and property damage, damages for death and for care and loss of services resulting from bodily injury and damages for loss of use of property resulting from property damage, and (b) with respect to personal injury, damages which are payable because of personal injury.' "

Most of the terms in the "definitions" section of the policies are defined by what the terms "mean." For example, the policies provide that " '[b]odily injury' means injury to the body of any person which occurs during the policy period and includes shock, mental anguish, mental illness, sickness or disease, but does not include injury arising out of personal injury." However, in a few instances, such as in the definition of "damages," the term is defined with respect to what it "includes." For example, the policies also state that the term " '[s]uit' includes an arbitration proceeding to which the INSURED is required to submit or to which the INSURED has submitted with the COMPANY'S consent."

The parties do not rely on the statement in the policies regarding what "damages" include or even refer to it in their briefs. We agree with their apparent assumption that the above policy language is not helpful to resolving the issue of whether "damages" also include payments by the insured to its own employees. That is because the statement regarding "damages" in the definition section of the policies, based on its plain meaning, does not exclude the possibility that the policies are intended to provide reimbursement to an insured for monies paid to its own employees to remedy damages arising from insured-against risks.

neither excludes nor expressly encompasses, as an injury or detriment, in-house costs for environmental remediation.

The phrase as a whole does not provide any further guidance. We note that, in *Schnitzer Investment Corp. v. Certain Underwriters*, 341 Or 128, 132, 137 P3d 1282 (2006), the court interpreted the same language that is at issue here, where the defendants agreed to "pay all sums 'which the insured shall become legally obligated to pay as damages because of * * * property damage.' " The court did not address the meaning of the word "damages," but was concerned with two different issues presented by the terms of the policy:

> "The first issue is whether there was 'property damage' to the groundwater—*i.e.*, whether physical damage (environmental contamination) had occurred to the groundwater during the policy period. The second issue is whether plaintiff was legally obligated to incur clean-up costs because of existing contamination to the groundwater. If it were, then defendants' policies required them to indemnify plaintiff for those costs."

*Id.* at 132. The court's analysis of the phrase as a whole does not suggest whether costs incurred can include *in-house* cleanup costs.[16]

Wausau contends that, when the term "damages" is viewed in the context of the policy as whole, it is apparent that the word "damages" refers only to the types of damages that may be incurred by a third-party claimant. It relies on another provision in the policy that governs "supplementary payments." That provision includes a category of payments for "reasonable expenses incurred by [Tektronix] at [Wausau's] request, including actual loss of wages or salary (but not loss of other income) not to exceed $25 per day because of his attendance at hearings or trials at such request." However, that provision also states that such supplementary payments are "in addition to the applicable limit of liability[.]" Thus, the fact that Wausau will pay some

---

[16] We note that the policies state that the damages will be paid "on behalf of" Tektronix. Arguably, that language suggests that Wausau is paying damages owed to a third party. Wausau does not make any argument based on that language, but, in any event, we conclude that the phrase does not resolve the ambiguity in the provision.

wages and expenses for such things as trial attendance has no bearing on whether Wausau also agreed to pay in-house remediation costs *as damages*.

Because the applicable provision remains ambiguous even after it is read in the context of the policy as a whole, we must interpret it against Wausau, its drafter. *Hoffman Construction Co.*, 313 Or at 470-71. Wausau could have chosen to limit damages to costs incurred by Tektronix as a result of payments to third parties. It did not do so. The trial court did not err in denying Wausau's motion *in limine* to exclude evidence of salaries and benefits paid to Tektronix employees for remediation work.

### 4. *The award of attorney fees to Tektronix*

Wausau's eighth assignment of error addresses the trial court's award of attorney fees. Because we reverse and remand for a new trial on Tektronix's breach of contract claim, we necessarily reverse the award of fees. ORS 20.220(3)(a) (providing that, on appeal, "[i]f the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed").

### B. *Tektronix's Cross-Appeal*

#### 1. *Application of the pollution exclusion to contamination at West Park and Building 16*

We turn now to Tektronix's cross-appeal. In its first assignment of error on cross-appeal, Tektronix argues that the trial court erred in ruling that, as a matter of law, the pollution exclusion barred recovery by Tektronix for contamination in the West Park and Building 16 areas.[17] In both areas, sludge containing solvents had been placed on the ground in a bermed area, with the expectation that the water in the sludge would evaporate, leaving the sludge segregated on the ground. The trial court concluded that the placement in the bermed area was the relevant "release" under the pollution exclusion and, as a result, coverage was excluded

---

[17] The trial court granted Wausau's motion *in limine* with respect to the application of the pollution exclusion to contamination at West Park and Building 16. Because the ruling was made pretrial, our remand for a new trial on Tektronix's breach of contract claim does not moot this assignment of error.

because the contamination was not unexpected or unintended.[18]

On appeal, Tektronix argues that, under *St. Paul Fire*, it was entitled to a jury determination on whether the leaching that occurred at West Park and Building 16 was unexpected and unintended. We agree.

We begin with the language of the policy exclusion, which provides that the insurance does not apply

"to bodily injury or *property damage arising out of* the discharge, dispersal, *release or escape of* * * * contaminants or pollutants *into or upon land,* the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

(Emphasis added.) Tektronix does not seek damages for property damage to the soil at West Park and Building 16. Rather, Tektronix seeks damages for property damage arising out of leaching of the contaminants *into* the groundwater. The relevant "release or escape" under the policies, then, is the escape of the pollutants *from* the bermed area *into* the groundwater. Whether that escape or release was "unexpected and unintended" is a matter for the jury. *St. Paul Fire*, 324 Or at 216.

2. *Prejudgment interest*

In its second assignment of error on cross-appeal, Tektronix argues that the trial court erred in failing to award prejudgment interest on the portion of damages based on Tektronix's internal labor costs. This issue is moot in light of our reversal of the judgment.

Reversed and remanded on appeal and on cross-appeal.

---

[18] The court reasoned,

"[West Park and Building 16] don't have anything that has any design component, natural or artificial, that is intended to actually be a containment vessel that would be analogous to a constructive landfill pit, even a significant above-ground impoundment, unlined or not. What we have is just dirt that's been graded. And yet there has been some berming, but essentially that was not intended to do and did not do anything additionally to contain the sludge material placed there. It simply increased the volume of sludge material that could be placed there."