**WILLMAR DEVELOPMENT, LLC, an Oregon limited liability company, Plaintiff,**

**v.**

**ILLINOIS NATIONAL INSURANCE COMPANY, a New York company, and Lexington Insurance Company, a Delaware company, Defendants.**

Civ. No. 09–6213–AA.

United States District Court, D. Oregon.

June 21, 2010.

---

Paul R.J. Connolly, Kevin J. Jacoby, Tyler P. Malstrom, Attorneys at Law, Salem, OR, for Plaintiff.

Lee Aronson, Attorney at Law, Portland, OR, Stephen G. Skinner, Jenny M. Churas, Attorneys at Law, Seattle, WA, for Defendants.

## OPINION AND ORDER

AIKEN, Chief Judge:

This is a diversity action arising out of a dispute concerning the parties' rights, duties, and obligations under a series of insurance policies. Plaintiff Willmar Development, LLC ("Willmar") alleges, among other things, that Defendants Illinois National Insurance Company and Lexington Insurance Company (collectively, "AIG") breached its duty to defend Willmar while it was covered under AIG's insurance policies. Willmar filed a motion for partial summary judgment asserting that it is entitled to judgment as a matter of law on its claim against AIG for breaching its duty to defend.

### BACKGROUND

Willmar is a homebuilder licensed in Oregon. Willmar constructed a house during 2005 and 2006, which Michael Walton and Aileen Cochran ("Walton/Cochran") contracted to buy on December 29, 2005. After moving into the house, doors began to stick and cracks began to develop in the sheetrock near windows, doors, and other points of stress. In March 2008, Walton/Cochran hired a geotechnical engineer to assess the situation. The engineer determined that the house's foundation had been built on substandard uncompacted fill, rather than native soil or properly compacted fill. The engineer also determined that the house's foundation was built near a creek bank, which lacked sheer strength and which would continue to erode. Finally, the engineer determined that the movement of soil under the house was causing the damage and that the house was in danger of collapsing.

Walton/Cochran filed a lawsuit against Mark D. Grentz, P.E. and Multi/Tech Engineering Services, Inc. (collectively, "Multi/Tech"), which had replaced the fill on the lot in 2003 for the previous lot owners. Walton/Cochran also filed a lawsuit against Daniel Redmond and Redmond & Associates, which had provided geotechnical engineering services on the lot. Later, on February 4, 2009, Walton/Cochran filed a third lawsuit against Willmar. In that lawsuit, the complaint ("First Amended Complaint") alleged claims for breach of contract and negligence. With regard to their negligence claim, Walton/Cochran first alleged that Willmar had built the house in a creek bed filled with uncompacted dirt and organic debris. Second, they alleged that the engineers tested only the top three feet of the fill for proper compaction. Third, they alleged that the home's foundation was defective because Willmar built the house on substandard fill-fill that was not native soil or not properly compacted. Fourth, they alleged that Willmar failed to disclose that it had built the house on substandard fill. Fifth, they alleged that Willmar failed to use proper care when constructing the house. Finally, they alleged that Willmar failed to use reasonable care to construct the house by failing to verify that the soil was suitable to support the construction of the house and to properly compact the fill.

Around September 28, 2009, Multi/Tech filed a third-party complaint ("Third Party Complaint") against Willmar. Multi/Tech alleged that Willmar acted negligently while it had primary responsibility for the house location, site preparation layout, construction, and both pre and post construction landscaping. As such, Multi/Tech alleged that any liability occurring from, among other things, soil settlement and erosion should attach to Willmar. Second, the Third Party Complaint incorporated by reference the allegations in the

First Amended Complaint involving house selection, site preparation, construction, and property maintenance and alleged that these were Willmar's responsibilities. Third, the Third Party Complaint alleged that Willmar performed landscaping and vegetation removal that, among other things, disturbed the erosion of the site. Lastly, the Third Party Complaint alleged that any liability concerning site stability, native vegetation, footing placement, drainage, soil erosion, or stream bank integrity should be designated to Willmar.

From June 21, 2004 to June 21, 2009, Willmar purchased five AIG general liability insurance policies ("Policy"). The Policy provided, in pertinent part, that AIG had a duty to defend the insured against lawsuits alleging "property damage." (Decl. of Stephen G. Skinner, Ex. A, at 20; Ex. B, at 16; Ex. C, at 16; Ex. D, at 19; Ex. E, at 25.) Upon learning about the claims against it, Willmar tendered the defense and indemnification of the claims to AIG. AIG denied Willmar's request.

Willmar filed the action at bar in November 2009. Willmar alleged that AIG breached its duty to defend Willmar against the underlying lawsuits. Willmar also alleged that AIG was obligated to indemnify Willmar for any liability resulting from the underlying lawsuits and to pay for damages arising out of AIG's denial of coverage. Willmar moved for partial summary judgment on the issue of whether AIG had breached its duty to defend Willmar against the Walton/Cochran and Multi/Tech lawsuits.

## STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law."

Fed.R.Civ.P. 56(c). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of a dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548,

Special rules of construction apply when evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Electrical,* 809 F.2d at 630.

## DISCUSSION

### I. Duty to Defend

AIG argues that it had no duty to defend Willmar against the Walton/Cochran and Multi/Tech lawsuits because the Policy does not cover the damages alleged in the underlying complaints. It contends that, even if the damages did fall within the Policy's coverage, they would be precluded under various exclusions.

 An insurer's duty to defend is a question of law and is determined by comparing the policy's terms with the facts in the complaint. *Marleau v. Truck Ins. Exch.,* 155 Or.App. 147, 152, 963 P.2d 715

(1998). An insurer has a duty to defend an insured if the complaint has any basis for which the insurer provides coverage. *Nielsen v. St. Paul Co.*, 283 Or. 277, 280, 583 P.2d 545 (1978). Courts have also held that a duty to defend exists if the facts in the complaint show that there is a possibility that the policy provides coverage for the claims. *Gebrayel v. Transamerica Title Ins. Co.*, 132 Or.App. 271, 275, 888 P.2d 83 (1995). Even if the complaint alleges some conduct outside the policy's coverage, the insurer still has a duty to defend if certain allegations in the complaint, without amendment, could impose liability that is covered under the policy. *See Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 506–07, 460 P.2d 342 (1969). Lastly, any ambiguity in the complaint with respect to whether the policy covers the allegations the insured. *Blohm v. Glens Falls Ins. Co.*, 231 Or. 410, 416, 373 P.2d 412 (1962).

The insured bears the initial burden of proving that a loss is covered under an insurance policy, while the insurer bears the burden of proving that a loss is excluded from coverage. *Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or.App. 485, 509, 156 P.3d 105 (2007). It is also the insured's burden to establish that their claim is within an exception to an exclusion. *Id.* at 514, 156 P.3d 105.

### 1. The Policy and Underlying Complaints

This court turns first to the Policy, First Amended Complaint, and Third Party Complaint, since they play a central role in determining whether AIG breached its duty to defend Willmar. Under the Policy, coverage is available only if there is "property damage" caused by an "occurrence." (Skinner Decl., Ex. A, at 20; Ex. B, at 16; Ex. C, at 16; Ex. D, at 19; Ex. E, at 25.) The Policy defines "property damage," as "[p]hysical injury to tangible property, including all resulting loss of use

of that property." (*Id.*, Ex. A, at 34; Ex. B, at 29; Ex. C, at 29; Ex. D, at 32; Ex. E, at 39.)

On its face, the alleged damages appear to fall under the definition of "property damage." The house's cracking sheetrock constitutes "physical injury," and the house itself is clearly "tangible property."

Under the Policy, "occurrence" is defined as an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*, Ex. A, at 33; Ex. B, at 29; Ex. C, at 29; Ex. D, at 32; Ex. E, at 38.) The Policy, however, fails to define the terra "accident." The dictionary definition of the terra "accident" is "an event or condition occurring by chance or arising from unknown or remote causes." Webster's Third New International Dictionary of the English Language, at 11 (2002). Black's Law Dictionary defines the term "accident" as "an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *Black's Law Dictionary*, at 16 (9th ed. 2009) (citing John F. Dobbyn, *Insurance Law in a Nutshell*, at 128 (3d ed. 1996)).

An insurer has a duty to defend if the complaint has any basis or a possibility for which the insurer provides coverage. Here, the First Amended Complaint makes numerous allegations of negligence against Willmar. It alleges, among other things, that Willmar constructed the house on soil that was not suitable to support its construction or not properly compacted. In addition, the Third Party Complaint alleges that Willmar acted negligently when it had primary responsibility for the house location, site layout, construction, and both pre and post construction landscaping. Lastly, although Willmar allegedly caused the harm through its inadequate workmanship, I find no evidence nor

does AIG contend, that the cause or harm was otherwise intended, anticipated, or expected. Rather, the damage to the Walton/Cochran house occurred from the continuous, substantial, and harmful earth movement underneath it. In light of the above, the express terms of the Policy provide coverage for the alleged damages in the underlying complaints.

AIG argues that Multi/Tech's "designation" of their liability to Willmar in the Third Party Complaint does not amount to "property damage" as required under the Policy. AIG, however, fails to cite to any precedent to supports its argument. Moreover, the liability in the Third Party Complaint arises from the same "property damage" in the First Amended Complaint, namely the cracking sheetrock of the Walton/Cochran house. In addition, the Third Party Complaint incorporates by reference the allegations made against Multi/Tech in the First Amended Complaint. As discussed earlier, those allegations are covered under the Policy.

### 2. Damages Arising Out of Contract or Tort

AIG also argues that the allegations in the First Amended Complaint involve damages resulting from a breach of contract between Willmar and Walton/Cochran, and that such damages are precluded from coverage because they do not qualify as "accidents" as required under the Policy. Conversely, Willmar argues that the underlying complaints make specific allegations of negligence, and as such, the alleged damages arise out of tort, not contract, and therefore, are covered under the Policy.

Oregon courts have differently interpreted the term "accident" within the meaning of insurance policies. *Kisle v. St. Paul Fire and Marine Ins. Co.*, 262 Or. 1, 5, 495 P.2d 1198 (1972). They have recognized that there can be no "accident" when the resulting damage is merely a breach of contract. *Oak Crest Const. Co. v. Austin Mut. Ins. Co.*, 329 Or. 620, 626, 998 P.2d 1254 (2000). In accord with the majority of decisions, however, Oregon courts have also recognized that, in certain instances, damage caused by the negligent performance of a contract can be recoverable in tort. *Kisle*, 262 Or. at 6, 495 P.2d 1198 (citing *Ramco, Inc. v. Pac. Ins.*, 249 Or. 666, 669, 439 P.2d 1002 (1968)). In light of the above, Oregon case law fails to provide a definitive answer in determining whether the alleged damages in the present case sound in contract, tort, or both.

AIG relies on *Kisle* to argue that the alleged damages in the present case arise out of contract. In *Kisle*, the Oregon Supreme Court held that the insured's damages were not damages caused by "accident" within the meaning of an insurance policy. *Id.* at 7, 495 P.2d 1198. In that case, the insured contracted with a rancher to repair the rancher's sprinkler system. *Id.* at 2, 495 P.2d 1198. The insured, however, failed to make the repairs until approximately two months after the agreed upon date. *Id.* at 4, 495 P.2d 1198. The rancher sued the insured, alleging that the insured had breached its contract by failing to make repairs within the agreed time. *Id.* The insured tendered defense of the action to the insurer. *Id.* The insurer, however, rejected the tender, stating that the action was for breach of contract, and therefore, was not covered under the insurance policy. *Id.* The court found that there was a significant distinction between negligent performance of a contract and a complete failure of timely performance. *Id.* at 6, 495 P.2d 1198. Accordingly, the court held that damages caused by the latter were not damages caused by "accident." *Id.*

*Kisle* is distinguishable. First, the damages in *Kisle* resulted from failure to time-

ly perform the contract. Conversely, here, the evidence does not show and the underlying complaints do not allege that the damages resulted from Willmar's failure to complete the project in a timely manner. Second, the complaint in *Kisle* only alleged breach of contract. By contrast, the complaints here allege both breach of contract and negligence.

AIG also relies on *Oak Crest* to support its argument that the alleged damages in the underlying complaints do not constitute damage caused by "accident." In that case, a general contractor incurred expenses to repair a subcontractor's deficient paint job. *Oak Crest*, 329 Or. at 629, 998 P.2d 1254. Such repairs were required to complete the contract. *See id.* The insurer refused to reimburse the general contractor, arguing that costs incurred to repair the subcontractor's work did not qualify as an "accident" under the insurance policy. *Id.* at 625, 998 P.2d 1254. The court agreed, holding that damages incurred from repairing deficient work as required under a contract amounted to contractual liability, not tort liability. *See id.* at 628, 998 P.2d 1254.

*Oak Crest* is also distinguishable from the case at bar. First, in *Oak Crest*, the damage involved repair work required to complete the project. By contrast, here, the alleged damages arose after the project was complete and did not result from repairs required to complete the project. Second, in *Oak Crest*, the complaint only alleged a breach of contract. Conversely, here, the complaints include allegations of negligence.

The cases on which AIG rely do little to persuade this court that the alleged damages in the complaints are not "occurrences" as defined under the Policy. Moreover, this court is reluctant to find that the alleged damages in the complaints sound only in contract, especially when considering that Oregon courts have previously held that damages caused by the negligent performance of a contract can, in certain circumstances, be recoverable in tort. *See Kisle*, 262 Or. at 5–6, 495 P.2d 1198; *Oak Crest*, 329 Or. at 628, 998 P.2d 1254; *Ramco*, 249 Or. at 669, 439 P.2d 1002.

## II. Interpretation of Insurance Policies

Next, AIG argues that the Policy does not cover the alleged damages because commercial liability policies do not operate as performance bonds for an insured's workmanship and because the alleged damages are precluded under a number of exclusions under the Policy. This court disagrees.

The interpretation of an insurance policy is a matter of law. *Employers Ins. of Wausau*, 211 Or.App. at 503, 156 P.3d 105. The court's objective in construing an insurance contract is to determine the intent of the parties. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469, 836 P.2d 703 (1992). To make that determination, the court uses a three-step process. *Id.* The first step is to examine the text of the policy to determine whether it is ambiguous, that is, whether it is susceptible to more than one plausible interpretation. *Tualatin Valley Hous. v. Truck Ins. Exch.*, 208 Or.App. 155, 159, 144 P.3d 991 (2006). The court will apply any definitions that are supplied by the policy itself, presuming that words have their plain, ordinary meanings. *Id.* If a term has only one plausible interpretation, then the term is interpreted in accordance with that unambiguous meaning. *Andres v. Am. Standard Ins. Co.*, 205 Or.App., 419, 423, 134 P.3d 1061 (2006) (citing *Hoffman*, 313 Or. at 469–70, 836 P.2d 703). If the wording of the policy is susceptible to more than one plausible interpretation, the court must examine the disputed terms in the context of the policy as a whole. *Id.* at

424, 134 P.3d 1061. As a last resort, the court resolves ambiguity by construing the term in favor of the insured. *Hoffman,* 313 Or. at 467–72, 836 P.2d 703. In the context of insurance contracts, the court will determine plain meaning from the perspective of a reasonable insured. *Id.* at 469–70, 836 P.2d 703.

### 1. Products–Completed Operations Hazard Coverage

AIG argues that the Policy does not cover the alleged damages in the underlying complaints because commercial liability policies do not act as a warranty or a performance bond for a contractor's workmanship. Additionally, it argues that insurance policies are meant to insure against damage to other property caused by inferior workmanship, not to the insured's own property. In opposition, Willmar argues that it had purchased "Products–Completed Operations Hazard" ("Products Completed") coverage, which specifically covers damages arising after the project's completion and due to the insured's work.

Generally, completed operations hazard provisions operate as exclusions, which preclude coverage for damage arising out of a contractor's own work or product. *See Fireguard Sprinkler Sys., Inc. v. Scottsdale Ins. Co.,* 864 F.2d 648, 649–50 (9th Cir.1988) (internal citation omitted). The idea behind the exclusion is that liability insurance should not act as a warranty or performance bond for general contractors because they control their own work. *Id.* at 650 (citing *Sw. Forest Indus. v. Pole Bldg., Inc.,* 478 F.2d 185, 187 (9th Cir. 1973)).

▅ Here, the Products Completed provision operates to cover, not exclude, damages arising out of Willmar's work. The provision provides coverage for all "'property damage' occurring away from premises you own or rent and arising out

of 'your work.'" (Skinner Decl., Ex. A, at 34; Ex. B, at 29; Ex. C, at 29; Ex. D, at 32; Ex. E, at 39.) The Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." (*Id.*) "Your work" is defined as "work or operations performed by you or on your behalf." (*Id.,* Ex. A, at 35; Ex. B, at 30; Ex. C, at 30; Ex. D, at 33; Ex. E, at 40.) As discussed earlier, the Policy expressly covers the "property damage" to the Walton/Cochran house. Furthermore, the alleged damages occurred away from Willmar's premises and resulted from Willmar's work. Accordingly, the plain language of the Policy covers the damage that occurred to the house.

AIG relies on three cases to support its proposition that an insurance policy is not a warranty or performance bond for a contractor's workmanship. Those cases, however, are distinguishable because the underlying insurance policies did not include completed operations hazard coverage. *See Cal. Ins. Co. v. Stimson Lumber Co.,* 2004 WL 1173185, at *6 (D.Or. May 26, 2004); *Anthem Elec., Inc. v. Pac. Employers Ins. Co.,* 302 F.3d 1049, 1057 (9th Cir.2002); *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.,* 383 F.3d 940, 948–49 (9th Cir.2004).

AIG is correct in acknowledging the general policy that insurance liability coverage does not act as a performance bond for an insured's work. AIG, however, fails to explain to the court how that policy argument fares in situations such as this where the contracting parties have agreed to include completed operations hazard coverage. Rather, this court is persuaded by the fundamental rule of contract interpretation that a court give policy's terms. Based solely on the contract's written provisions and the plain meaning of those provisions, this court infers that the par-

ties intended AIG to provide coverage for damages arising out of and to Willmar's work.

## 2. Exclusions

The court now turns to any exclusions under the Policy that may preclude coverage for the alleged damages in the underlying complaints. The Policy contains a number of exclusions, four of which are relevant here.

In accordance with the three-step interpretive process set forth in *Hoffman,* this court will look at the Policy's terms, including any relevant definitions, and apply the plain meanings of its terms to determine the parties' intentions. If the language is ambiguous, meaning it is susceptible to more than one plausible interpretation, the court will examine the disputed terms in the context of the policy as a whole.

### a. The Land Subsidence Exclusion

■■■ AIG argues that even if the damages in the underlying complaints are covered under the Policy, they would still be precluded under the Land Subsidence and Land Condemnation Exclusion ("Land Subsidence Exclusion"). Conversely, Willmar argues that the exclusion only applies to damages caused by earth movement resulting from natural events, not human-caused events. In the alternative, Willmar argues that because the exclusion omits the term "cause" or a synonym of it, the exclusion is ambiguous and, therefore, should be construed against the drafter.

Under the Policy, the Land Subsidence Exclusion precludes coverage for "any liability arising out of land subsidence." (Skinner Decl., Ex. A, at 51; Ex. B, at 48; Ex. C, at 51; Ex. D, at 54; Ex. E, at 68.) The policy defines "land subsidence" as earth movement, which includes "sinking or settling of land, earthquake, earth movement, earth expansion and/or contraction, landslide, mud flow, slipping, falling away, caving in, eroding and earth rising or shifting or tilting." (*Id.*)

Willmar cites to two cases to support its position that the Land Subsidence Exclusion is ambiguous and should therefore, be interpreted in its favor. In *Nautilus Insurance Co. v. Vuk Builders, Inc.,* 406 F.Supp.2d 899, 904–05 (N.D.Ill.2005), the court held that the land subsidence exclusion was ambiguous. The earth movement exclusion in that case precluded coverage for property damage "caused by, resulting from, contributed to or aggravated by" land subsidence. *Id.* at 904. The policy defined "subsidence" as "earth movement, including but not limited to landslide, mud flow, earth sinking, rising or shifting." *Id.* The court held that the cause of the earth movement was ambiguous and construed the policy in favor of the insured because the exclusion did not clearly state whether it applied to land subsidence caused by natural events, human-made events, or both. *Id.*

Similarly, in *Wisconsin Builders, Inc. v. General Ins. Co. of America,* 65 Wis.2d 91, 221 N.W.2d 832, 838 (1974), the court held that the earth movement exclusion was ambiguous. The exclusion there precluded coverage for any loss "caused by, resulting from, contributed to or aggravated by any . . . earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, earth rising or shifting. . . ." *Id.* at 834. The court held that the land subsidence exclusion only precluded coverage for damages caused by natural events, not human events, because it failed to state otherwise. *See id.* at 838.

*Nautilus* and *Wisconsin Builders* are persuasive. In *Nautilus* and *Wisconsin Builders,* the policies excluded damage "caused by, resulting from, contributed to or aggravated by" land subsidence without clearly stating whether they applied to human-made events. Similarly, the exclu-

sion in the present case excludes coverage for "any liability arising out of land subsidence" without specifying whether it applies to human-caused land subsidence, naturally occurring land subsidence, or both.

By contrast, AIG relies on *City of Carlsbad v. Insurance Co. of State of Pennsylvania*, 180 Cal.App.4th 176, 102 Cal. Rptr.3d 535, 540 (2009), where the court held that the land subsidence exclusion precluded coverage for damages caused by land subsidence resulting from human and natural events. *Id.* The land movement exclusion in that case precluded coverage for "property damage arising out of land subsidence for *any reason whatsoever.*" *Id.* at 537 (emphasis added). The policy defined "land subsidence" as "the movement of land or earth, including, but not limited to, sinking or settling of land, earth movement, earth expansion and/or contraction, landslide, slipping, falling away, caving in, eroding, earth sinking, and earth rising or shifting or tilting." *Id.* The court held that the plain language of the exclusion, from a layperson's perspective, precluded coverage for damages resulting from land subsidence caused by anything, human-made, or otherwise. *See id.* at 539. It reasoned that the term "for any *reason* whatsoever" meant "any *cause* whatsoever," and as such, it did not matter whether the insured's negligence caused the landslide. *Id.* (emphasis added).

*City of Carlsbad* is distinguishable in several ways. First, the standard from which the court determined the plain meaning differs. The court in *City of Carlsbad* determined the plain meaning from a layperson's perspective. By contrast, this court must determine the plain meaning from the perspective of a reasonable insured. Second, and more important, the exclusionary terms are significantly different. In *City of Carlsbad*, the exclusion precluded coverage for damages

"arising out of land subsidence for any reason whatsoever." Conversely, in the present case, the exclusion precludes coverage for "any liability arising out of land subsidence." The policy in the present case does not contain the language "for any reason whatsoever," which is significant since the court in *City of Carlsbad* interpreted that language to mean for "any *cause* whatsoever." In light of the above, *City of Carlsbad* is unpersuasive.

AIG also cites *Ruede v. City of Florence*, 231 Or.App. 435, 442, 220 P.3d 113 (2009), where the court held that the exclusion precluded coverage for damages arising out of earth movement caused by human and natural events. In that case, the sentence introducing the exclusion stated that the insurance would not cover damage "regardless of any other cause or event." *Id.* Additionally, the text of the exclusion listed "improperly compacted soil." *Id.* The court held that the exclusion encompassed human contributions to earth sinking because it expressly stated "regardless of any other cause" and because it listed a human-created cause, namely "improperly compacted soil." *Id.*

However, *Ruede* is distinguishable for several reasons. First, the earth movement exclusion in *Ruede* excluded all damages resulting from earth movement "regardless of any other cause or event." Conversely, in the present case, the Land Subsidence Exclusion does not include the term "cause." Second, unlike *Ruede*, the exclusion here does not list a human-created cause, cause as "improperly compacted soil."

Lastly, AIG relies on *Montee v. State Farm Fire and Casualty Co.*, 99 Or.App. 401, 782 P.2d 435 (1989). *Montee*, however, is not on point because the court in that case addressed the term "collapse" in conjunction with an ensuing loss provision. Moreover, the court declined to address

the earth movement exclusion, stating that it was "unnecessary for [the court] to decide whether the losses also come within the 'earth movement' exclusion of the policy." *Id.* at 405 n. 3, 782 P.2d 435. As such, this court declines to follow *Montee.*

AIG's strongest argument is that Oregon courts have interpreted the term "any" to "incorporate an element of inclusiveness, as evidenced for example, by the definitions, 'whichever,' 'every,' and 'all.' " *Wiederhorn v. Multnomah Athletic Club,* 215 Or.App. 392, 396, 170 P.3d 1 (2007). Therefore, AIG argues that the term "any liability arising out of land subsidence" should be interpreted to mean "whichever," "every," and "all" possible liabilities, regardless of cause. AIG's interpretation is reasonable. However, Willmar's interpretation is also reasonable.

▮ As noted earlier, if the wording of the policy is susceptible to more than one plausible interpretation, the court must examine the disputed terms in the context of the policy as a whole. Since both of the parties' interpretations of the Land Subsidence Exclusion are reasonable, we turn to the context of the Policy. This court interprets the Policy with the "assum[ption] that parties to an insurance contract do not create meaningless provisions." *Hoffman,* 313 Or. at 472, 836 P.2d 703 (citing *N.Z. Ins. v. Griffith Rubber,* 270 Or. 71, 75, 526 P.2d 567 (1974) (an insurance policy must be reasonably interpreted "so that no part of it is ignored and effect can be given to every word and phrase")). In doing so, this court finds that other exclusions in the policy shed light on the parties' intention regarding the Land Subsidence Exclusion.

This court first starts with the Fungus Exclusion, which provides, in pertinent part, that there is no coverage for any loss arising from fungus "regardless of any other cause, event, material, product and/or building component...." (Skinner Decl., Ex. A, at 39; Ex. B, at 38; Ex. C, at 43; Ex. D, at 46; Ex. E, at 60.) Second, the exclusion for war provides, in pertinent part, that the Policy does not cover " 'property damage', however caused, arising, directly or indirectly, out of ... [w]ar, including undeclared or civil war...." (*Id.,* Ex. A, at 38; Ex. B, at 19; Ex. C, at 19; Ex. D, at 22; Ex. E, at 28.) Third, the Nuclear Hazard exclusion provides, in pertinent part, that the insurer will not pay for "loss caused by or resulting from a nuclear reaction y(3)27 whether caused by natural, accidental, or artificial means." (*Id.,* Ex. A, at 58; Ex. B, at 54; Ex. C, at 59; Ex. D, at 65; Ex. E, at 91.)

The exclusions above illustrate that, at the very least, AIG had considered causation when drafting its exclusions and expressly precluded coverage for any liability arising out of certain events, regardless of cause, by using the "regardless of any other cause," "however caused," and "whether caused by natural, accidental, or artificial means" phrases. Accordingly, the omission of those phrases in the Land Subsidence Exclusion is not without meaning and is significant. By excluding those phrases in the Land Subsidence Exclusion, I conclude that the parties intended to only exclude damages arising out of earth movement resulting from natural events, not human-caused events.

#### b. Exclusion j

This court turns next to "Exclusion j," which excludes coverage for the following:

j. Damage to Property

"Property Damage" to:

\* \* \*

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

\* \* \*

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

* * *

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

* * *

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

* * *

(Skinner Decl., Ex. A, at 24; Ex. B, at 19–20; Ex. C, at 19–20; Ex. D, at 22–23; Ex. E, at 28–29.)

Paragraph (2) of Exclusion j does not apply if (1) the premises are Willmar's work; and (2) the premises were not occupied, rented, or held for rental by Willmar. Here, there is no evidence that Willmar occupied, rented, or held for rental the house that it constructed and sold to Walton/Cochran. As such, paragraph (2) of Exclusion j does not apply.

Additionally, paragraph (6) of Exclusion j does not apply (1) to physical damage to tangible property; and (2) when the injury occurs away from premises that Willmar owns. Here, the alleged damage to the Walton/Cochran house occurred away from Willmar's premises. As such, paragraph (6) of Exclusion j also does not apply.

### c. Exclusion k

This court turns next to "Exclusion k," which excludes coverage for " '[p]roperty damage' to 'your product' arising out of it or any part of it." (Id., Ex. A, at 24; Ex. B, at 20; Ex. C, at 20; Ex. D, at 23; Ex. E, at 29.) The Policy defines "your product" as "goods or products, other than real property, manufactured, sold, handled, distributed or disposed of" by the insured.

(Id., Ex. A, at 35; Ex. B, at 30; Ex. C, at 30; Ex. D, at 33; Ex. E, at 39–40.)

Under the Policy, Exclusion k does not apply to real property, which is the type of property at issue in the present case. AIG cites to Mid–Continent Casualty Co. v. Titan Const. Corp., 281 Fed.Appx. 766, 769 (9th Cir.2008) (internal citation omitted), for the proposition that a building is a "product" for the purposes of a product exclusion. However, AIG misstates the language of that court, which held that a building is not a "product" for the purposes of product exclusions. Id. ("[The] policy before us, however, unlike the policies cited in [other] cases, expressly excepts 'real property' from the definition of 'product,' and the plain language of the policy controls."). Accordingly, Exclusion k does not apply in this case.

### d. Exclusion l

Finally, this court addresses "Exclusion l," which precludes coverage for the following:

1. Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Skinner Decl., Ex. A, at 24; Ex. B, at 20; Ex. C, at 20; Ex. D, at 23; Ex. E, at 29.)

Exclusion l does not apply if a subcontractor performed the work from which the damages arise. Willmar argues that the First Amended Complaint alleges that "Defendant Willmar, and/or Defendant's agents" negligently constructed the house's foundation and footings. (Reply Mem. in Supp. of Mot. for Partial Summ. J. of Liab. on Duty to Defend, at 16 (citing Auth. Decl. of Paul R.J. Connolly in Supp.

of Pl.'s Mot. for Partial Summ. J. of Liab. on Duty to Defend, Ex. 6, ¶ 4.)) As such, Willmar contends Exclusion 1 should not apply. This court agrees.

## CONCLUSION

For the reasons stated above, Willmar's motion for partial summary judgment (doc. 17) is granted. Request for oral argument is unnecessary.

IT IS SO ORDERED.